IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| SAMUEL DANIELS, ON BEHALF OF HIMSELF AND A CLASS OF OTHERS SIMILARLY SITUATED; AND LETICIA ANDERSON, <br><br> Plaintiffs, <br><br> v. <br><br> TRADITIONAL LOGISTICS AND CARTAGE, LLC, A KENTUCKY LIMITED LIABILITY COMPANY; et al; <br><br> Defendants. | Case No. 4:20-00869-CV-RK |

## ORDER

Before the Court is Defendants' motion to for summary judgment on Counts V and VI of the Amended Complaint. (Doc. 58.) The motion is fully briefed. (Docs. 59, 70, 75.) For the reasons below, the motion is **GRANTED.**

### Background[1]

Plaintiff Samuel Daniels filed his Complaint on October 28, 2020, alleging, among other things, that Defendants Traditional Logistics and Cartage, LLC ("TLC"), RCS Transportation, LLC ("RCS"), and Valiant Management and Holdings, LLC ("Valiant") (jointly, "Defendants")[2] unlawfully discriminated against him in violation of 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981 when they failed to promote or failed to upgrade him from a Casual Driver to a Full-Time Driver. (Doc. 59 at ¶ 1.) On July 23, 2021, Plaintiff Daniels filed a motion for leave to file an

---

[1] The following facts are taken from the parties' statements of uncontroverted material facts. The Court has omitted some properly controverted facts, assertions that are immaterial to the resolution of the pending motion, assertions that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

[2] TLC, RCS, and Valiant are all limited liability companies organized in the state of Kentucky with their principal places of business in Kentucky and conducting substantial and continuous business in Missouri. (Doc. 41 at ¶¶ 4-18.) At all times relevant to this case, TLC, RCS, and Valiant operated out of the same principal place of business and conducted and/or maintained and/or managed a place of business in Kansas City, Missouri. (*Id.* at ¶ 22.) Management and administrative decisions for Defendants TLC and RCS are performed by Defendant Valiant. (*Id.* at ¶ 23.) The Defendants all share the same Chief Financial Officer, Chief Executive Officer, and Chief Operations Officer. (*Id.* at ¶¶ 24, 26.)

Amended Complaint to add Leticia Anderson as a second named plaintiff in this case. (Doc. 39.) After Defendants did not respond to Plaintiff Daniels' motion to file an Amended Complaint by the deadline to do so, on August 18, 2021, the Court granted Plaintiff Daniels' motion to amend the complaint as unopposed. (Doc. 40.) On August 18, 2021, Plaintiffs Samuel Daniels and Leticia Anderson filed their Amended Complaint, in which they seek relief individually and on behalf of two classes which they allege are "similarly situated" in that they are black employees who were passed over for the opportunity to become Full-Time Drivers in favor of other non-black employees. (*Id.* at ¶¶ 3-5; Doc. 41, ¶ 93.) In their Amended Complaint, Plaintiffs allege statistical data which they claim supports their allegations of disparate impact, including:

> a. As of May 2019, TLC employed approximately seventy (70) to eighty (80) Casual Drivers.
>
> b. At that time, approximately twenty-five (25) to thirty-five (35) (or approximately thirty-one percent (31%) to fifty percent (50%)) of the Casual Drivers were black.
>
> c. As of May 2019, TLC employed approximately ninety-six (96) Full-Time Drivers.
>
> d. At that time, approximately thirteen (13) (or approximately fourteen percent (14%)) of the Full-Time Drivers were black.

(Doc. 59 at ¶ 6.) Class I is defined as: black employees working for Defendants as Casual Drivers (or other substantially similar positions) who were not offered positions as Full-Time Drivers (or other substantially similar positions) between August 30, 2018, and the present. (*Id.* at ¶ 7.) Class II is defined as: black employees working for Defendants as Casual Drivers (or other substantially similar positions) who were not offered positions as Full-Time Drivers (or other substantially similar positions) between October 28, 2016, and the present. (*Id.* at ¶ 8.)

TLC's drivers are categorized as Full-Time or Casual. (*Id.* at ¶ 9.) Casual Drivers work for TLC part-time on an as-needed basis. (*Id.* at ¶ 10.) Plaintiff Anderson was hired as a Casual Driver on April 27, 2018. (Doc. 70-1, PSAUF ¶ 1.)[3] Plaintiff Daniels was hired as a Casual Driver on or about May 1, 2018. (Doc. 59 at ¶ 12.) Among potential members of the putative class, Mona-Lisa Carr-Jacobs began working for TLC as a Casual Driver on June 8, 2018, Adriana Seward on May 4, 2018, Ellery Leggs on July 16, 2018, Marquita Summers on June 8, 2018, and

---

[3] PSAUF refers to "Plaintiff's Statement of Additional Uncontroverted Facts," which start numbering over with paragraph 1. (Doc. 70-1, page 15.)

2

Sharon Warren on June 8, 2018. (Doc. 70-1 at PSAUF ¶¶ 2-6.) Plaintiffs, Carr-Jacobs, Seward, Leggs, Summers, and Warren are all black. (*Id.* at ¶ 7.)

Job applications for Casual Drivers are collected by the Kansas City Full Employment Counsel and forwarded to TLC. (Doc. 59 at ¶ 13.) Casual Drivers are also hired through referrals from other employees. (*Id.* at ¶ 14.)

The terminal manager at TLC KC Drive Away terminal was Wayne Ghan beginning in 2018. Prior to each shift, Terminal Manager Wayne Ghan ("Ghan") determines whether Casual Drivers are needed for the upcoming shift and how many are needed. (*Id.* at ¶ 15.) Emily Gordon, a clerk at the TLC KC Drive Away terminal, calls Casual Drivers from a list to see if they are available to work. (*Id.* at ¶ 16.) Casual Driver responses are categorized as either a no answer, answer and decline to work, or answer and come in to work. (*Id.* at ¶ 18.) Between May and August 2018, three TLC Casual Drivers were promoted to Full-Time Driver positions. (*Id.* at ¶ 19.) Plaintiffs have not been promoted to Full-Time Drivers. (*Id.* at ¶ 20.)

Per the Collective Bargaining Agreement between TLC and the Teamsters Local 41 (the union), the union notifies TLC of the need to hire more Full-Time Drivers. (*Id.* at ¶ 21.) The union also provide recommendations on specific employees they suggest should be hired. (*Id.* at ¶ 22.) The individual TLC locations have discretion to set their own criteria for hiring Full-Time Drivers. (*Id.* at ¶ 23.)

As terminal manager of TLC Kansas City Drive Away, Ghan is responsible for hiring Full-Time Drivers. (*Id.* at ¶ 24 and p. 11.) Valiant did not provide Ghan with any selection criteria. (*Id.* at ¶ 25.) Michael Ford, Chief Operating Officer of Valiant and owner of TLC, did not provide Ghan advice or information on which Casual Drivers to hire Full-Time. (*Id.* at ¶ 26 and p. 11.)[4] TLC never advertised they were hiring Full-Time positions or afforded employees the opportunity to apply for Full-Time status. Further, employees were only notified after the fact when someone was promoted from Casual to Full-Time Driver. (Doc. 71-1 at PSAUF ¶ 20.) In 2016 and 2017, Ghan's predecessor, Mitch Mobley, made the decisions regarding hiring Casual Drivers as Full-Time Drivers. (*Id.* at PSAUF ¶ 28.)

---

[4] Both Plaintiffs and Defendants utilize internal pagination systems different than those applied by the CM/ECF system. Throughout this Order, references to the record will utilize the pages assigned by the parties.

Around May of 2019, Ghan asked Teresa Sage, Office Manager of TLC Kansas City Drive Away, and Emily Gordon to provide him a list of names to consider for Full-Time Driver positions. (Doc. 59 at ¶ 27 and p. 11.) Sage provided Ghan a list of the names of 14 Casual Drivers she recommended be promoted to Full-Time, five of whom were black. (*Id.* at ¶ 28; Doc. 71-1 at PSAUF ¶ 14.) Emily Gordon also recommended four additional Casual Drivers for a total of 18. (Doc. 59 at ¶ 29.) Ghan narrowed the list of 18 Casual Drivers to ten for consideration. Then on May 24, 2019, Ghan hired five of these Casual Drivers as Full-Time Drivers.[5] Ghan did not promote Plaintiffs. (Doc. 59 at ¶¶ 33, 35.) None promoted were black. (Doc. 71-1 at PSAUF ¶ 15.)

Plaintiff Daniels filed a charge of discrimination with the Missouri Commission on Human Rights ("MCHR") and the Equal Employment Opportunity Commission ("EEOC") on June 26, 2019. (*Id.* at ¶ 36.) Plaintiff Daniels filed an Amended Charge of Discrimination ("Amended Charge") with the EEOC and MCHR on December 19, 2019. (*Id.* at ¶ 37.) The factual allegations in the Amended Charge were substantially the same as those in the original charge, except the amended charge added Valiant and RCS as Defendants. (*Id.* at ¶ 38.) The allegations in the forms Daniels filed with the EEOC included the following:

---

[5] Although Plaintiffs dispute it was the criteria Ghan used in deciding which Casual Drivers to hire to Full-Time Drivers, in his deposition, Ghan testified the criteria he used for hiring Casual Drivers to Full-Time Drivers included the driver's attendance, job performance, reliability (that is, coming in to work when called), and moving vehicles to the correct destination. (*Id.* at ¶ 30.) Sage and Ghan testified Sage provided Ghan information about Casual Drivers' attendance, punctuality, and working when called. (*Id.* at ¶ 31.) Ghan also testified Gordon provided him information about whether Casual Drivers turn work down. (*Id.* at ¶ 32.) Ghan further testified he consulted with Gordon regarding each driver's attendance and punctuality and reviewed each driver's personnel file to evaluate their time records. (*Id.* at ¶ 34.) Ghan did not use seniority as a factor in determining which Casual Drivers to hire as Full-Time. (Doc. 71-1 at PSAUF ¶ 12.)

Plaintiffs dispute that the criteria stated by Ghan were those he actually used in deciding who to promote from Casual Drivers to Full-Time Drivers. For purposes of determining the appropriateness of summary judgment on Plaintiffs' disparate impact claims, however, even viewing the evidence in the light most favorable to Plaintiffs, Ghan's testimony as to his motivations is irrelevant – the basis of disparate impact is the impact of the challenged practice or policy, rather than the motivation of the person or people implementing such practice or policy. *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 862 (D. Minn. 1993) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971); 2 Arthur Larson & Lex K. Larson, *Employment Discrimination,* § 50.83(a), at 10–142.2 (1993) (comparing disparate treatment and disparate impact cases)) (considering plaintiffs' anecdotal evidence of discrimination only in its analysis of plaintiffs' disparate treatment claim and not its disparate impact claim); *cf. Catlett v. Mo. Highway & Transp. Comm'n*, 589 F. Supp. 929, 944 (W.D. Mo. 1983) (citing *Equal Emp't Opportunity Comm'n v. Am. Nat'l Bank*, 652 F.2d 1176, 1188 (4th Cir. 1981)) (observing that "[a]lthough a prima facie showing may in the proper case be made by statistics alone, it may also be established by a cumulation of evidence, including patterns, practices, general policies or specific instances of discrimination.")

> There are approximately seventy (70) to eighty (80) Casual Drivers currently employed by TLC, of whom approximately twenty-five (25) to thirty-five (35) (or approximately 31-50%) are black. However, of the approximately ninety-six (96) total Full-Time employees, thirteen (13) (or approximately 14%) are black. Approximately one time per year, TLC goes through "hires," that is, transferring employees from Casual Drivers to Full Time. During my employment I have witnessed two rounds of hires, over those two rounds, TLC transitioned eight (8) Casual Drivers to Full-Time Drivers, and none were black (three (3) in 2018 and five (5) this year). Further, in 2017, three employees were transitioned to Full Time. Two were black females, but none were black males.

(*Id.* at ¶ 39.) On November 7, 2019, Plaintiff Daniels was interviewed by an investigator for the EEOC regarding his Charge, during which he was asked "Why do you believe you were not hired as a full-time driver [] because of your race?" (*Id.* at ¶¶ 40-41.) Plaintiff Daniels responded:

> Just looking at the past hires and the fact they don't let you know how they hire. We are scared to ask about the process. If you ask you might be fired. The Union is in on it too, they don't have any information. I went to them and they don't know. No [seniority] list, they don't have anything. There are 96 full-time drivers.

(*Id.* at ¶ 41.) Ghan did not preserve any of his notes as to his May 2019 hiring decision-making process, which the EEOC found to be a violation of Title VII. (Doc. 71-1 at PSAUF ¶ 17.)

Plaintiff Daniels was deposed in this lawsuit on May 17, 2021, during which he was asked, "Have you ever made any complaints of discrimination while working for any employer?" and he answered, "No." (Doc. 59 at ¶¶ 42-3.) Later in the deposition, Plaintiff Daniels testified he complained to union steward Ernest Rideau after Ghan promoted five non-black Casual Drivers to Full-Time in May 2019. (Doc. 70-1, ¶ 43.) When Daniels was asked for additional details as to his claim that black drivers were "overlooked," Plaintiff testified as follows:

> Q. Can you provide a little bit more detail for me? They were acknowledging what that they were overlooked, and who are we both talking about?

> A. Discrimination. When you acknowledge – well, I don't want to go too deep into an acknowledgment because I would basically say what we're talking about black people as a history in America. So what I'm saying is we acknowledge that there has been this type of a history. So when people are talking in conversation, there's an acknowledgment to say, hey, we were overlooked in this standpoint. We're used to be being overlooked in areas. So when I – that's the acknowledgment.

> Q. When you say overlooked, are you referring to anything specific with respect to TLC, RCS, or Valiant?

> A. Yes. Full-time employment.

(Doc. 59 at ¶ 44.)

Plaintiff Daniels' only conversation with anyone about RCS's hiring practice was with a man he could not identify who "kind of made a comment to me, because he said he was the […] only black full-time driver that they had." (*Id.* at ¶ 45.) Plaintiff Daniels testified he was not aware of anyone complaining to a supervisor or manager with respect to discrimination at TLC, RCS, or Valiant. (*Id.* at ¶ 46.) Plaintiff Daniels testified he is not claiming that Emily Gordon is biased as to race. (*Id.* at ¶ 47.) Plaintiff Daniels testified "I feel like it was about my race." (*Id.* at ¶ 48.) When Plaintiff Daniels was asked what facts support that belief, he testified:

> A. Well, the two hires. June 18th. June or July of 2018. I think it was July. Was the first go-round, where they hired three drivers. And they hired two white drivers and they hired one Samoan driver, which is a – so in that case they hired a guy that had only been there six months. Which, you know, that's what they did. I didn't understand that at that time. I didn't understand how they hired. And then the next go-round, they hired four whites.
>
> Q. In May of 2019?
>
> A. May of 2019. Yes.
>
> Q. Okay. They hired what?
>
> A. Four whites and one Mexican – one Hispanic.

(*Id.* at ¶ 49.) Plaintiff testified the only other information he had to support his belief that he was not hired because of his race was that another white individual "was hired after two months of being hired as a casual in 2019. He was hired. And he was basically hired as a full-time driver after two months. And the whole place went – kind of uproared [sic] about that." (*Id.* at ¶ 50.) Plaintiff Daniels also testified he never interacted with Ghan and he never experienced TLC managers treating him differently from other Casual Drivers. (*Id.* at ¶¶ 55-6.)

From 2014 to April 14, 2021, TLC employed 503 Casual Drivers; 121 of them were black, and of those, 69 were males and 52 were females. (*Id.* at ¶¶ 61-2.) In the same period, TLC employed 360 white Casual Drivers; of those, 210 were males, 146 were females, and four did not specify their sex. (*Id.* at ¶ 63.) Beginning October 19, 2015, TLC promoted 36 Casual Drivers to Full-Time, of those, nine were black, 25 were white, and two were of other races. (*Id.* at ¶ 64.) Of the nine black Casual Drivers promoted to Full-Time, there were six males and three females. (*Id.* at 65.) TLC had a total of 118 different employees working as Casual Drivers in Kansas City on May 31, 2018, and/or May 28, 2019, 29 of whom were black. (Doc. 71-1 at PSAUF ¶ 21-2.) Some of the employees that worked for TLC as Casual Drivers on May 31, 2018, continued to be employed with TLC on May 28, 2019. (*Id.* at PSAUF ¶ 21.) TLC hired three Casual Drivers into

6

Full-Time Driver positions between May 31 and June 4, 2018, none of whom were black. TLC hired five additional Casual Drivers to Full-Time Driver positions on May 28, 2019. (*Id.* at PSAUF ¶¶ 23-5.) Michael Ford had never reviewed the hiring decisions or any demographic data regarding the racial breakdown of employees at TLC's Kansas City Drive Away terminal until he was required to do so to respond to Plaintiff Daniels' EEOC Amended Charge. (*Id.* at PSAUF ¶ 38.)

Due to the COVID-19 pandemic, Ford Motor Company engaged in periodic shutdowns of production, furloughs of employees, and reductions in staffing. (Doc. 59 at ¶ 71.) When Ford reduces or stops production of vehicles, there is a corresponding reduction in the need for TLC drivers' services. (*Id.* at ¶ 72.) As a result of the COVID-19 pandemic, TLC has not promoted any Casual Drivers to Full-Time status since May 29, 2019. (*Id.* at ¶ 73.)

Plaintiff Daniels dually filed an amended charge of discrimination against Defendants with the EEOC and with the MCHR. (Doc. 1-9.) Both were timely filed. On the EEOC charge form, Plaintiff Daniels checked boxes for "race" and "sex" discrimination. (*Id.*) On July 30, 2020, the EEOC sent Plaintiff Daniels a letter stating it was terminating its processing of his charge and notifying him that he had a right to sue in court. (Doc. 1-10.)

After Plaintiffs filed their Amended Complaint in this case, on August 30, 2021, Defendants filed a motion to dismiss, arguing Plaintiff Anderson's Counts I, II, V, and VI (Title VII race discrimination claims) in the Amended Complaint failed to state a claim upon which relief may be granted because she failed to exhaust administrative remedies. (Doc. 48.) The Court denied Defendants' motion to dismiss on November 12, 2021, finding an EEOC investigation into race discrimination reasonably could be expected to result from the timely filed amended charge, and thus that Defendants were on adequate notice of a race discrimination claim from the amended charge. (Doc. 78 at 6.)

Thereafter, Defendants filed this motion for summary judgment on Count V (Disparate Impact: Race – Failure to Promote) and Count VI (Disparate Impact: Race – Failure to Upgrade) of the Amended Complaint. (Doc. 59.)

## Legal Standard

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences."

7

*Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). "If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment should be granted." *Smith-Bunge v. Wis. Central, Ltd.*, 946 F.3d 420, 424 (8th Cir. 2019) (citation omitted).

At the summary judgment stage, the movant must "support" its motion either by "citing to particular parts of materials in the record" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986);Rule 56(c)(1).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Rule 56(c); *see also Thomas v. Corwin,* 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). An "adverse party may not rely merely on allegations or denials, but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Rule 56(e)). In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted). To controvert a factual position, the nonmoving party must "refer specifically to those portions of the record upon which [he] relies." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (citation omitted).

## Discussion

Defendants argue they are entitled to judgment in their favor and against Plaintiffs on Counts V (Violation of 42 U.S.C. §§ 2000e et seq., Disparate Impact: Race – Failure to Promote (Class I)) and VI (Violation of 42 U.S.C. §§ 2000e et seq., Disparate Impact: Race – Failure to Upgrade (Class I)) of their Amended Complaint on the grounds that:

    A. Plaintiffs have the burden of establishing their prima facie case of disparate impact under Counts V and VI and cannot meet that burden;

    B. Promotion rates for TLC drivers show that black Casual Drivers are not disfavored;

    C. Statistical analysis by an expert witness is required for Plaintiffs to establish their prima facie case, and they have disclosed no such expert;

D. Plaintiffs have not supplemented their deficient statistical evidence with anecdotal evidence of discrimination; and

E. Plaintiffs cannot represent a class if they cannot establish their prima facie case.

(Doc. 58.) In their opposition to Defendants' motion, Plaintiffs argue (1) TLC did not promote black Casual Drivers at a rate comparable to white Casual Drivers during the period in which Ghan was making hiring decisions, (2) expert statistical analysis is not necessary for Plaintiffs to establish a prima facie claim for disparate impact under Title VII, and (3) Plaintiffs have provided sufficient circumstantial evidence of a policy that caused the disparate treatment of black Casual Drivers. (Doc. 70.)

## I. Disparate Impact – 42 U.S.C. §§ 2000e et seq.

Under Title VII, the Eighth Circuit has explained:

> an unlawful disparate impact is established under that statute "only if," as relevant here, "a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race . . . and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i).

*Bennett v. Nucor Corp.*, 656 F.3d 802, 817 (8th Cir. 2011). In order to establish their *prima facie* case of disparate impact under this provision, it is Plaintiffs' burden to show: "'(1) an identifiable, facially-neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two.'" *Id.* (quoting *Mems v. City of St. Paul*, 224 F.3d 735, 740 (8th Cir. 2000), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011)).

Due to the necessity of Plaintiffs' reliance on statistical evidence to show causation, such evidence "'must be of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" *Id.* (quoting *Mems*, 224 F.3d at 740). "[T]he Court need not presume the plaintiff's statistical evidence is reliable." *Delgado-O'Neil v. City of Minneapolis*, 745 F. Supp. 2d 894, 909 (D. Minn. 2010), *aff'd*, 435 F. App'x 582 (8th Cir. 2011) (citing *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 995 (1988)).

## II. Plaintiffs' Prima Facie Disparate Impact Showing

Plaintiffs' Amended Complaint states the challenged policy or practice is Defendants' failure to utilize a documented system or standard for selecting which Casual Drivers to promote

9

to Full-Time and their failure to utilize an application system for Casual Drivers to apply to become Full-Time Drivers. (Doc. 41, ¶¶ 173, 187.) Plaintiffs claim this policy or practice has caused a disparate impact on black Casual Drivers. (*Id.* at ¶¶ 177, 191.)

Defendants contend they are entitled to summary judgment on Plaintiffs' Counts V and VI disparate impact claims because Plaintiffs' statistical evidence is incorrect, Plaintiffs employ incorrect methodology in attempting to demonstrate a disparate impact, and Plaintiffs cannot show disparate impact without an expert witness, which they have not identified. Plaintiffs respond that they make an adequate showing for their prima facie case of disparate impact, specifying that although they and the other black Casual Drivers comprised 23% of the Casual Driver population at the time Wayne Ghan determined or was in charge of deciding which Casual Drivers to promote in 2018 and 2019, zero percent of the eight Casual Drivers he ultimately promoted were black. (Doc. 70 at 2.) Plaintiffs further assert that even if the methodology Defendants urge is utilized, the Defendants' methodology would likewise demonstrate black Casual Drivers were disparately impacted by Defendants' promotion practices under Ghan's watch. (*Id.*) Plaintiffs contend they do not need an expert because the statistical disparity is so great. (*Id.* at 7.)

For establishing a prima facie case of disparate impact, the EEOC has adopted guidance known as the "Four-Fifths (4/5) Rule." *Stewart v. City of St. Louis, Paul E. Davis*, No. 4:04CV00885 RWS, 2007 WL 6211634, at *8 (E.D. Mo. May 25, 2007), *aff'd sub nom. Stewart v. City of St. Louis*, 532 F.3d 939 (8th Cir. 2008). Pursuant to these guidelines,

> [a] selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

29 C.F.R. § 1607.4(D).

Notably, however, the rule also expressly contemplates the limited usefulness of the four-fifths guidance in situations involving a small sample size: "Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant[.]" *Id.*

In addition, "[t]he EEOC has adopted the Uniform Guidelines to 'assist employers . . . to comply with the requirements of Federal law prohibiting employment practices which discriminate on grounds of race . . .'" *Stewart*, 2007 WL 6211634, at *9 (quoting Uniform Guidelines, Section

10

1A, B). "While the Uniform Guidelines reference the Four-Fifths Rule, the Uniform Guidelines at Question and Answer 20 establish that the Four-Fifths Rule should *not* be used when the number of selections is small[.]" *Id.* This section provides:

> . . . [A] difference of more than 20% in rates of selection may not provide a basis for finding adverse impact if the number of persons selected is very small. For example, if the employer selected three males and one female from an applicant pool of 20 males and 10 females, the 4/5ths rule would indicate adverse impact (selection rate for women is 10%; for men 15%; 10/15 or 66 2/3% is less than 80%), yet the number of selections is too small to warrant a determination of adverse impact. In these circumstances, the enforcement agency would not require validity evidence in the absence of additional information (such as selection rates for a longer period of time) indicating adverse impact.

44 Fed. Reg. 11, 996 (Mar. 2, 1979).

Federal courts have adhered to this guidance. *Stewart*, 2007 WL 6211634, at *9 (citing *Mems*, 224 F.3d at 740 (noting, "even where the Four-Fifths Rule is violated, differences in the selection rates may not constitute an adverse impact where the sample size is too small to be statistically significant"); *NAACP v. City of Mansfield,* 866 F.2d 162, 168 (6th Cir. 1989) ("[T]his court has been cautious about giving too much weight to 'four-fifths' computations where the sample base is of less than significant proportions."); *Frazier v. Consol. Rail Corp.,* 851 F.2d 1447, 1451 (D.C.Cir. 1988) (approving the district court's rejection of the 80% rule where the sample size was small); *Fudge v. City of Providence Fire Dep't,* 766 F.2d 650, 658-59 & n.10 (1st Cir. 1985) (the four-fifths rule is not an accurate test of adverse impact when the sample size is small); *Bridgeport Firebird Soc'y v. City of Bridgeport,* 686 F.Supp. 53, 59 n. 6 (D.Conn. 1988) ("The 'four-fifths' rule may not be a valid indicator of adverse impact when applied to exceptionally small groups")).[6] Even outside of the small-sample-size context, "courts have required more than

---

[6] In addition, it has also been noted that "[a]lthough the four-fifths rule may serve as a helpful benchmark in certain circumstances, both the Supreme Court and the EEOC have emphasized that courts should not treat the rule as generally decisive." *Jones v. City of Bos.*, 752 F.3d 38, 51 (1st Cir. 2014) (citing *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 995 (1988) (noting that the rule "has been criticized on technical grounds . . . and has not provided more than a rule of thumb for courts"); 44 Fed. Reg. 11996–01 (explaining that the rule was "not intended as a legal definition" and was "not intended to be controlling in all circumstances")). The First Circuit also "previously rejected reliance on the four-fifths rule by a plaintiff in a case in which the sample size was small, describing the rule as 'not an accurate test of discriminatory impact.'" *Id.* (citing *Fudge v. City of Providence Fire Dep't,* 766 F.2d 650, 658 n. 10 (1st Cir. 1985)). Other circuits "have both minimized the importance of four-fifths rule and criticized it directly." *Id.* (citing *Stagi v. Nat'l R.R. Passenger Corp.*, 391 Fed. Appx. 133, 138 (3d Cir. 2010) (unpublished) ("[T]he 'four-fifths rule' has come under substantial criticism, and has not been particularly persuasive."); *Clady v. Los*

a showing that the four-fifths rule was violated" to establish a prima facie showing of the causation element of disparate impact. *Delgado-O'Neil*, 745 F. Supp. 2d at 911.

To this point, "Congress has expressly mandated that Title VII shall not be interpreted to require any employer to grant preferential treatment or numerical quotas." *Bennett v. Nucor Corp.*, No. 3:04CV00291 SWW, 2006 WL 2473015, at *14 (E.D. Ark. Aug. 25, 2006), *aff'd*, 656 F.3d 802 (8th Cir. 2011) (citing 42 U.S.C. § 2000e-2(j)). "For this reason, a plaintiff's burden to establish a prima facie case of disparate impact goes beyond showing a bottom-line statistical disparity or racial imbalance in the employer's workforce." *Id.* (citing *Watson*, 487 U.S. at 994 n.2 ("This congressional mandate requires in our view that a decision to extend the reach of disparate impact theory be accompanied by safeguards against the result that Congress clearly said it did not intend.")).

In view of this concern, courts have recognized that when a group's population is small, statistical tests should be used to determine whether a four-fifths rule violation is the product of chance. *Bazile v. City of Houston*, 858 F. Supp. 2d 718, 764 (S.D. Tex. 2012) (citing *Black v. City of Akron*, 831 F.2d 131, 134 (6th Cir.1987) ( "[P]laintiffs are correct that the 4/5 rule has been criticized when used in the context of a small sample of employees being tested."); *Fudge*, 766 F.2d at 658 ("We think that in cases involving a narrow data base, the better approach is for the courts to require a showing that the disparity is statistically significant, or unlikely to have occurred by chance, applying basic statistical tests as the method of proof."). "[C]ourts frequently accept a .05 probability 'to rule out the possibility that the disparity occurred at random.'" *Bazile*, 858 F. Supp. 2d at 765 (citing *Stagi v. Nat'l R.R. Passenger Corp.*, 391 Fed. App'x 133, 137-38 (3d Cir. 2010); *Page v. U.S. Indus., Inc.*, 726 F.2d 1038, 1047 n.5 (5th Cir. 1984) (noting that in *Castaneda v. Partida*, 430 U.S. 482, 496-97 n. 17 (1977), the Supreme Court's "guidance" was that "a disparity in the number of minority workers in upper and lower level jobs is statistically significant if the difference between the expected number of minority employees in higher level positions exceeds the actual number by more than two or three standard deviations"); *Palmer v. Shultz*, 815 F.2d 84, 92-96 (D.C. Cir. 1987) (noting that "statistical evidence meeting the .05 level of significance is certainly sufficient to support an inference of discrimination" (citation, internal quotation marks, and alterations omitted)); *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370,

---

*Angeles Cty.*, 770 F.2d 1421, 1428 (9th Cir. 1985) ("[T]he 80 percent rule has been sharply criticized by courts and commentators.")).

1376 (2d Cir. 1991) ("Social scientists consider a finding of two standard deviations significant, meaning there is about one chance in 20 that the explanation for a deviation could be random and the deviation must be accounted for by some factor other than chance." (citation omitted))). There are "three generally accepted statistical tests for determining whether a 4/5 Rule violation resulted from chance – the Fisher exact, the Pearson chi-square, and the $Z_d$ tests." *Id.*

Here, Plaintiffs argue they have properly shown disparate impact, contending, "Plaintiffs demonstrate that although they and the other Black Casual Drivers comprised 23% of the Casual Driver population at the time Wayne Ghan was determining which Casual Drivers to promote in 2018 and 2019, *zero percent* of the eight casual drivers he ultimately promoted were black." (Doc. 70 at 2) (emphasis in original).

Plaintiffs' proposed sample size of nine total promotions (Doc. 70 at 4) is too small to establish a statistical pattern. *Mems*, 224 F.3d at 740 (citing with approval *Shutt v. Sandoz Crop Protection Corp.*, 944 F.2d 1431, 1433 (9th Cir.1991) (stating group of eleven is too small to establish a statistical pattern)); *Stewart*, 2007 WL 6211634, at *10 (finding the evidence as to disparate impact, as measured by the four-fifths rule, stemming from the battalion chief exam, did not establish a prima facie case of discrimination because the number of selections was too small, where there had been only 16 white applicants and 10 black applicants who took the test, with only two candidates promoted). Moreover, in offering only a bottom-line racial imbalance, Plaintiffs fail to eliminate common non-discriminatory reasons for the disparity in promotion rates by way of any analysis of statistical significance (e.g. through an expert report or by including any methodology appropriate for establishing statistical significance in the context of a small sample size).

Defendants argue that in addition to being unable to establish any alleged disparities in promotion rates of black Casual Drivers and white Casual Drivers are statistically significant, Plaintiffs further fail to supplement their deficient statistical evidence with anecdotal evidence of discrimination. Because proof of discriminatory motive is not required in disparate impact analysis – the focus being on consequences of employment practices rather than motivations – "statistical analysis is more central to claims of disparate impact discrimination, without regard to whether anecdotal evidence is presented." *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 862 (D. Minn. 1993) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971); 2 Arthur Larson & Lex K. Larson, *Employment Discrimination,* § 50.83(a), at 10–142.2 (1993) (comparing disparate

13

treatment and disparate impact cases)) (considering plaintiffs' anecdotal evidence of discrimination only in its analysis of plaintiffs' disparate treatment claim and not its disparate impact claim); *cf. Catlett v. Mo. Highway & Transp. Comm'n*, 589 F. Supp. 929, 944 (W.D. Mo. 1983) (citing *Equal Emp't Opportunity Comm'n v. Am. Nat'l Bank*, 652 F.2d 1176, 1188 (4th Cir. 1981)) (observing that "[a]lthough a prima facie showing may in the proper case be made by statistics alone, it may also be established by a cumulation of evidence, including patterns, practices, general policies or specific instances of discrimination.") Accordingly, the Court is not required to consider anecdotal evidence of discrimination in the context of analyzing Plaintiffs' prima facie case of disparate impact.[7]

Plaintiff cannot show the challenged policy or practice (Defendants' failure to utilize a documented system or standard or application system for Casual Drivers to apply) for selecting which Casual Drivers to promote to Full-Time causes a disparate impact on black Casual Drivers. Plaintiffs rely on baseline statistics with no expert analysis to control or account for other variables that may affect the promotion decisions cited. Because Plaintiffs have not provided such analysis, their disparate impact claims in Counts V and VI cannot survive summary judgment.[8]

## Conclusion

Accordingly, Defendants' motion for summary judgment on Counts V and VI of the Amended Complaint (Doc. 58) is **GRANTED.**

**IT IS SO ORDERED.**

/s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: May 5, 2022

---

[7] *Ex gratia*, the Court finds the declarations lack foundation, are not based on personal knowledge, contain hearsay, and are irrelevant to Plaintiffs' claims.

[8] Because summary judgment in favor of Defendants is granted on Plaintiffs' Counts V and VI, the Court also concludes a certifiable class does not exist as to the claims of Counts V and VI. *Sample v. Monsanto Co.*, 283 F. Supp. 2d 1088, 1094 (E.D. Mo. 2003) (denying all motions relating to certification of the class based on certain claims due to granting summary judgment in favor of the defendant on those claims).